UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cv-22361-ALTMAN

CAL BRIDGE, INC.,

     *Plaintiff,*

*v.*

ONECAL,

     *Defendant.*

_____/

## ORDER

Cal Bridge, Inc. created and patented a "bridge" between incompatible electronic calendars—a "synchronization service" that "receive[s] . . . notifications" on one calendar and updates another calendar under preset rules. Amended Complaint [ECF No. 21] ¶ 15. OneCal allegedly built an identical calendar-syncing service. *See id.* ¶ 21. So, Cal Bridge sued OneCal for patent infringement ("Count I") and several species of unfair competition and false advertising ("Counts II–IV"). *See id.* ¶¶ 27–91. OneCal now moves to dismiss the Amended Complaint ("MTD") [ECF No. 27], insisting that Count I fails because Cal Bridge's patent is "invalid," MTD at 4; Counts II–IV are insufficiently pled, *see id.* at 4–5; and, whatever the merits, Counts II–IV should be dismissed as "a classic shotgun pleading," *id.* at 4 & n.3. Cal Bridge filed a Response [ECF No. 35], and OneCal submitted its Reply [ECF No. 39].

After careful review, we agree that Counts II–IV form a shotgun pleading—and that, in any event, they're improperly pled. But we'll give Cal Bridge one chance to fix all those defects. At the same time, OneCal hasn't shown that Cal Bridge's claims are ineligible for patent protection—at least at this early stage of the case. We therefore **GRANT in part** and **DENY in part** the MTD.

## BACKGROUND

Cal Bridge describes itself as a provider of "calendar syncing solutions" for "users who maintain multiple calendars . . . hosted by different calendar hosts," like Microsoft Exchange and Google Calendar. Am. Compl. ¶ 8. In Cal Bridge's telling, people who use different calendar systems "without proper synchronization" face several problems, like "missed appointments, double bookings, inefficiency, [and] lack of productivity." *Ibid.* These headaches, it explains, are caused by the "technological limitations" of traditional electronic calendar systems that "prevent[ ] effective . . . synchronization" across "different calendar hosts[.]" *Id.* ¶¶ 8–9. "[D]ifferent calendar hosts typically use different, proprietary APIs [ ] that inhibit synchronization of events across different hosts." *Id.* ¶ 9. In other words, traditional calendar hosts weren't designed to talk to each other—only to "calendar clients." *Ibid.*

For example, a consultant might keep "a Microsoft Outlook calendar" tied to "an email address on their employer's domain" ("Company A") and "a Google calendar" tied to an email address on the domain of a client ("Company B"). *Id.* ¶ 10. In "conventional systems," when the consultant (or a colleague) views the consultant's schedule on the Outlook calendar, "events that were sent" to the consultant's Company B email address "are not visible." *Ibid.* And when Company B's employees view the consultant's schedule on the Google calendar, "events that were sent" to the consultant's Company A email address are likewise "not visible." *Ibid.* Cal Bridge adds that "corporate policies and access restrictions" can "disable" synchronization, *e.g.*, when a company "restrict[s]" access "due to privacy or confidentiality concerns" to "only a particular" device. *Id.* ¶ 11. And, Cal Bridge alleges, "manually copying or forwarding events between calendars is error prone," can cause "double bookings" and "breaches of confidentiality," and is sometimes "not possible" when the user's device is "geographically remote." *Id.* ¶ 12.

Cal Bridge says that it solved these issues when it built the "CalendarBridge solution," which is a "cloud-based system" that "automatically sync[s] a user's calendar events across multiple calendar hosts in real-time." *Id.* ¶ 13. The United States Patent and Trademark Office awarded Cal Bridge a patent for that system: U.S. Patent No. 11,461,739 ("'739 Patent"), titled "Privacy-Sensitive, Multi-Calendar Synchronization." *Id.* ¶ 14. Cal Bridge broadly describes how the '739 Patent achieves the cross-host synchronization across two different electronic calendar systems:

> The '739 Patent improves conventional systems by, among other things, providing a database service and a calendar synchronization service that together operate to receive application programming interface notifications for events on a first electronic calendar and, in response, issue commands to the host of a second electronic calendar according to a set of rules that determine what properties of the events are to be propagated and what notifications (if any) are to be added [to] second calendar.

*Id.* ¶ 15.

Claim 11 of the '739 Patent—the lead claim in dispute here, along with Claims 13–17[1]—further breaks down how the patent's services are configured to achieve cross-host synchronization:

> A system comprising:
>
> circuitry configured to operate as a calendar synchronization service and circuitry configured to operate as a database service, wherein:
>
>> the database service is configured to store rules for propagating events from a first electronic calendar hosted by a first calendar

---

[1] OneCal also challenges Claims 13–17, which are labeled as "systems" of Claim 11. *See* Am. Compl. ¶ 38 (providing that "Claim 13 of the 739 patent" is "[t]he *system* of claim 11, wherein: the API is an API of the calendar synchronization service; the calendar synchronization service is configured to receive a request to the API from the first calendar host; and the receive of the notification is the result of the request" (emphasis added)); *id.* ¶ 41 (providing that "Claim 14 of the 739 patent" is "[t]he *system* of claim 11, wherein: the rules determine what, if any, portion of a summary property of the first event on the first electronic calendar is to be propagated to the second event on the second electronic calendar; and the summary property contains information as would be found in a summary property of an iCalendar file for the first event" (emphasis added)); *id.* ¶ 44 (providing that "Claim 15 of the 739 patent" is "[t]he *system* of claim 11, wherein: the rules determine what, if any, portion of a description property of the first event on the first electronic calendar is to be propagated to the second event on the second electronic calendar; and the description property contains information as would be found in a description property of an iCalendar file for the first event" (emphasis added)); *id.* ¶ 47

> host to a second electronic calendar hosted on a second calendar host, wherein:
>
>> the rules determine what properties of the events on the first electronic calendar are to be propagated to the second electronic calendar; and
>>
>> the rules determine what, if any, notifications are to be added to the second electronic calendar for events propagated from the first electronic calendar;
>
> the calendar synchronization service is configured to receive, via an application programming interface (API), a notification of a first event on the first electronic calendar, wherein the first event has a start time, duration, summary, description, and one or more attendees; and
>
> the calendar synchronization service is configured to issue, in response to the receive [sic] of the notification, one or more commands to the second calendar host to generate a second event on the second electronic calendar according to the rules for propagating events from the first electronic calendar to the second electronic calendar.

*Id.* ¶ 30.

Cal Bridge says that the '739 Patent, "including the subject matter of at least claims 11 and 13–17, is directed to specific improvements in computer functionality and provides specific implementations of solutions to problems with conventional electronic calendar." *Id.* ¶ 14. For example, when "events from one electronic calendar are propagated to the host of another electronic calendar, . . . a user's complete schedule from multiple calendars is viewable from a single calendar client." *Id.* ¶ 16. The patent, among other things, uses rules "that determine what information is automatically synced and which information is not" while "incorporat[ing] privacy controls" that let

---

(providing that "Claim 15 of the 739 Patent" is "[t]he *system* of claim 11, wherein: the rules determine what, if any, portion of one or more attendee properties of the first event on the first electronic calendar is to be propagated to the second event on the second electronic calendar; and the one or more attendee properties contains information as would be found in one or more attendee and/or organizer property of an iCalendar file for the first event" (emphasis added)); *id.* ¶ 50 (providing that "Claim 17 of the 739 patent" is "[t]he *system* of claim 11, wherein the rules determine that a notification for the second event should be added to the second electronic calendar" (emphasis added)).

users "maintain[ ] confidentiality." *Id.* ¶ 18. It also lets users "configure how notifications are handled when propagating events between calendars," giving them "full control over event reminders and alerts." *Id.* ¶ 17.

According to Cal Bridge, OneCal's founder signed up for the CalendarBridge solution "to gain access to the proprietary . . . system and its functionality"—and, "[l]ess than two weeks later," he announced that he would build "onecal.io." *Id.* ¶ 20. Cal Bridge adds that OneCal markets its service (the "OneCal System") as a cloud-based system that "will keep your events up to date in real time on all configured calendars," *id.* ¶ 21 (cleaned up), with instructions on its website at https://docs.onecal.io, *id.* ¶ 22. Notably, OneCal allegedly pitches itself as "a CalendarBridge alternative" and "the #1 CalendarBridge alternative"; has "directly target[ed] CalendarBridge customers"; and has offered a "switching discount" to users who move from CalendarBridge to OneCal. *Id.* ¶ 23. OneCal's advertising supposedly goes one step further by "deceptively and falsely misrepresenting" the CalendarBridge solution's features—saying, among other things, that CalendarBridge "lacks certain functionality" can "only synchronize two calendars at the same time[.]" *Id.* ¶ 24.

In the Amended Complaint, Cal Bridge asserts four claims against OneCal: Count I is a patent-infringement claim under 35 U.S.C. § 271, alleging that the OneCal System "directly infringes at least claims 11 and 13–17 of the ['739 Patent]," *id.* ¶ 29; Count II is a false-advertising and unfair-competition claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), *id.* ¶¶ 67–74; Count III is an unfair-competition claim under Florida law, *id.* ¶¶ 75–84; and Count IV alleges violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), *id.* ¶¶ 85–91.

## THE STANDARD

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Megladon, Inc. v.*

*Vill. of Pinecrest*, 661 F. Supp. 3d 1214, 1221 (S.D. Fla. 2023) (Altman, J.) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, but legal conclusions without adequate factual support are entitled to no assumption of truth." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) (cleaned up). "Patent eligibility can be determined at the Rule 12(b)(6) stage. . . . only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) (citations omitted).

### DISCUSSION

OneCal attacks the Amended Complaint on four different grounds: *one*, it says that Count I "should be dismissed because the claims in the '739 Patent" consist of "only abstract ideas" and, therefore, "are not patent eligible," MTD at 6; *two*, it claims that "Counts II–IV should be dismissed on the independent basis that they constitute a classic shotgun pleading," *id.* at 4 n.3; *three*, alternatively, it maintains that Count II fails to state a claim of "false advertising," "reverse passing off," or "trade dress infringement" under the Lanham Act, *id.* at 19–20; and *four*, it contends that Counts III and IV "are preempted by federal patent law," *id.* at 15.

As we'll explain, OneCal hasn't shown that the '739 Patent is invalid, so Count I survives. But we'll strike the remaining counts, since we agree that Counts II–IV constitute an impermissible shotgun pleading. And even if they didn't, OneCal hasn't stated a plausible claim under the Lanham Act—and its state-law claims are problematically pled and vulnerable to preemption.

I.      **OneCal Hasn't Shown that the '739 Patent Is Invalid.**

a.   *The Standard*

Section 101 of the U.S. Patent Act provides that, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof," may obtain a patent. 35 U.S.C. § 101. The Supreme Court has held, though, that "[l]aws of nature, natural phenomena, and abstract ideas are not patent eligible." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting *Assoc. for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)). We follow a two-step framework (the "*Alice* test") to determine whether a patent is eligible under § 101. At Step One, "we determine whether the claims are directed to a 'patent-ineligible concept,' such as an abstract idea." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1362 (Fed. Cir. 2020) (quoting *Alice*, 573 U.S. at 218). "If the claims are not directed to a patent-ineligible concept[,]" then "the claims satisfy § 101 and we need not proceed to the second step." *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018) (quoting *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018)). But if they are directed at a patent-ineligible concept, we proceed to Step Two, where we "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 78–79 (2012)). If the claims are directed to a patent-ineligible concept *and* there's no transformation, they're not eligible under § 101.

b.   *Analysis*

OneCal asks us to find that Cal Bridge's '739 Patent is a nullity under the *Alice* test. It argues that, under *Alice*'s Step One, Claim 11 of the '739 Patent is an "abstract idea" that's ineligible for protection because it's "a quintessential 'do it on a computer' patent'" and "can be achieved via pen and ink." MTD at 13. Plus, under Step Two, OneCal says that the patent isn't eligible because it

"identifies only conventional computer equipment" and components. *Id.* at 14. And OneCal asserts that "Claims 13–17 are dependent claims that recite the same basic system presented in Claim 11 with only minor changes," so, if Claim 11 is ineligible, then Claims 13–17 are too. *Id.* at 11. Cal Bridge responds that its patent isn't abstract under Step One because "the character of the claims is unequivocally directed to specific improvements in computer functionality that solve problems related to electronic calendar systems," Resp. at 4 (cleaned up), and it insists that, under Step Two, the claims include a sufficiently "inventive concept" and that, in any event, Step Two "turns on questions that cannot be resolved" on a Rule 12(b)(6) motion, *id.* at 12. We agree with Cal Bridge.

As an initial matter, OneCal *may* be right that Claims 13–17 depend on Claim 11. Under 28 U.S.C. § 112(d), a dependent claim will "contain a reference to a claim previously set forth and then specify a further limitation" and will be treated as "incorporat[ing] by reference all the limitations of the claim to which it refers." 35 U.S.C. § 112(d). Claims 13–17 seem to employ a dependent-claim form. Claim 13 begins: "The system of claim 11, wherein: . . . [,]" Am. Compl. ¶ 38; and the same hook appears in Claims 14–17, *see also id.* ¶ 41 (as to Claim 14: "The system of claim 11, wherein: . . . ."); *see also id.* ¶ 44 (same as to Claim 15); *id.* ¶ 47 (same as to Claim 16); *id.* ¶ 50 (same as to Claim 17). "To establish whether a claim is dependent upon another," though, we must "examine[ ] if the new claim both refers to an earlier claim *and further limits* that referent." *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1357 (Fed. Cir. 2007) (emphasis added). And "[a] claim's status as dependent or independent depends on the *substance* of the claim in light of the language of [§ 112(d)], and not the form alone." *Ibid.* (emphasis added & citation omitted). OneCal doesn't engage with this inquiry. It doesn't analyze Claims 13–17's language or evaluate their substance or limitations at all; it simply asserts that "Claims 13–17 are dependent claims that recite the same basic system presented in Claim 11 with only minor changes" and argues that, "if Claim 11 is ineligible for protection then the dependent claims must fail as well." MTD at 11. For its part, Cal Bridge counters that Claims 13–17

each "provide . . . specific implementation[s] of a solution" that OneCal "failed to address" in its
MTD. Resp. at 20. Since OneCal chose to attack Claims 13–17 only inasmuch as they "hinge" on
Claim 11's eligibility, we'll treat any challenge to the additional limitations in Claims 13–17 as forfeited
for now. And, because we conclude below that Claim 11 *is* patent eligible, we don't need to resolve
whether Claims 13–17 are dependent claims.

i.    *Alice* Step One

At Step One, we ask whether the '739 Patent claims are "directed to" patent-ineligible
concepts. *Alice*, 573 U.S. at 217. In analyzing Step One, "the claims are considered in their entirety to
ascertain whether their character *as a whole* is directed to excluded subject matter." *McRO, Inc. v. Bandai
Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016) (emphasis added) (quoting *Internet Patents
Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)). The Federal Circuit has held that
"software patent claims" satisfy *Alice* Step One "when they are 'directed to a specific implementation
of a solution to a problem in the software arts,' such as an improvement in the functioning of a
computer." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (quoting *Enfish,
LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338–39 (Fed. Cir. 2016)).

As we'll demonstrate, Claim 11 is a *rule-based* software patent claim. A rule-based patent claim
will survive Step One when it is "the incorporation of the claimed rules," and "not the use of the
computer, that improve[s] the existing technological process by allowing the automation of further
tasks." *McRO, Inc.*, 837 F.3d at 1314; *see, e.g.*, *Enfish, LLC*, 822 F.3d at 1339 (finding that the asserted
claims satisfied Step One where the proposed "self-referential table" was "a specific type of data
structure designed to *improve the way* a computer stores and retrieves data in memory," so the claims
were "directed to a specific implementation of a solution to a problem in the software arts," and
therefore were "not directed to an abstract idea"). In contrast, when the "claims require the use of a
computer," but it is "th[e] incorporation of a computer, not the claimed rule," that purportedly

"improve[s] [the] existing technological process" by allowing the automation of further tasks, the claims aren't eligible for protection. *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 224); *see, e.g.*, *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (recognizing that rule-based models that merely "collect[ ] information" or "analyz[e] information by steps people go through in their minds, or by mathematical algorithms, without more," lie within the "realm of abstract ideas" (collecting cases)). Cal Bridge has plausibly shown that Claim 11 falls within the former category and is thus eligible for patent protection.

Before we get to OneCal's arguments, we'll describe *exactly* what Claim 11's rule-based scheme does to achieve synchronization across two different electronic calendars. Claim 11 describes a calendar "bridge" built from two components: "circuitry configured to operate as a calendar synchronization service" and "circuitry configured to operate as a database service." Am. Compl. ¶ 30. The "database service" is "configured" to "store rules for propagating events" from "a first electronic calendar hosted by a first calendar host" to "a second electronic calendar hosted on a second calendar host." *Ibid*. Those rules achieve propagation in two ways: *one*, they "determine what properties of the events on the first electronic calendar are to be propagated to the second electronic calendar"; *two*, they "determine what, if any, notifications are to be added to the second electronic calendar for events propagated from the first electronic calendar." *Ibid*. In turn, the "calendar synchronization service" is "configured" to "receive, via an application programming interface ('API'), a notification of a first event on the first electronic calendar," and then to "issue, in response to the receive [sic] of the notification, one or more commands to the second calendar host to generate a second event on the second electronic calendar according to the rules[.]" *Ibid*.

Now for the underlying question: What's the non-abstract idea to which Claim 11 is directed? Cal Bridge says that '739 Patent is "directed to specific improvements in computer functionality and provides specific implementations of solutions to problems with conventional electronic calendars[.]"

*Id.* ¶ 14. It then identifies the real-world constraints that Claim 11's rules are meant to solve. In traditional systems, "different calendar hosts typically use different, proprietary APIs," such that "[n]o standard commands for performing calendar tasks . . . [are] operable across different email hosts," and "calendar hosts are configured to communicate with calendar clients, not with other calendar hosts," which "hinder[s] synchronization across different calendar hosts." *Id.* ¶ 9. And so, the '739 Patent achieves otherwise *impossible* cross-host synchronization, which Cal Bridge says, "could not be performed by a human ex[er]cising generic computer-implemented steps or with 'pen and paper.'" *Id.* ¶ 14.

In plain English, Claim 11 *doesn't* just use a computer to "merely implement an old practice in a new environment," *Intell. Ventures I LLC v. Erie Indem. Co.*, 711 F. App'x 1012, 1016 (Fed. Cir. 2017), and it doesn't just "collect information" or "analyz[e] information by steps people go through in their minds," *Elec. Power Grp.*, 830 F.3d at 1353. Cal Bridge's non-abstract theory is that Claim 11's architecture solves a problem in the electronic calendar space by allowing, for the first time, incompatible calendar platforms to communicate. These are the kinds of allegations that are dispositive at *Alice*'s Step One because it's "the incorporation of [Claim 11's] rules," rather than the simple "use of the computer," that "improve[s] the existing technological process by allowing the automation of further tasks." *McRO, Inc.*, 837 F.3d at 1314; *see, e.g., Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007–08 (Fed. Cir. 2018) (finding that the asserted claim satisfied Step One where, "[w]hen considered as a whole, and in light of the specification," it was "not directed to an abstract idea" but "directed to a specific method for navigating through three-dimensional electronic spreadsheets," providing "a *specific solution to then-existing technological problems*" because prior art spreadsheets "were not user friendly" and required users to "master many complex and arbitrary operations" (emphasis added)); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018) (finding that the asserted claims satisfied Step One where they were "directed to a non-abstract

improvement in computer functionality," because the method "employs a new kind of file" that "enables a computer security system to do things *it could not do before*" (emphasis added)).

The crux of OneCal's objection is that it's nothing special for Cal Bridge to just "configur[e]" databases "to apply certain 'rules.'" MTD at 13. It insists that the '739 Patent simply consists of abstract rules that automate a process of which the "ultimate objective—synchronizing various calendars[2]—could be achieved via pen and ink." *Ibid.* But, even accepting that, at a high level of generality, Claim 11 is *just rules*, and that someone technically *could* achieve all this manually, Claim 11 still isn't patent-ineligible. "[E]ven though a claim can be abstracted to the point that it reflects a patent-ineligible concept—for, '[a]t some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas,'" *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. 66, 71 (2012))—"that claim may nevertheless be patent eligible if the claim language is directed to a patent-eligible *application* of that concept," *FairWarning IP, LLC*, 839 F.3d at 1094 (citing *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016) (emphasis added)). And Cal Bridge plausibly alleges a patent-eligible *application*: Claim 11's specific rule-based system achieves

---

[2] We think OneCal grossly oversimplifies what the '739 Patent accomplishes. In the course of achieving cross-host synchronization, the '739 Patent does much more. It *also* "determine[s] what information is automatically synced and which information is not": *e.g.*, where a consultant "creates a new calendar event on their employer's electronic calendar that contains event information regarded as confidential, the rules may dictate that the calendar synchronization service automatically propagates to another calendar host an event that merely indicates the consultant is 'busy' and omit the confidential information." *Id.* ¶ 18. In short, the '739 Patent claims achieve *selective* synchronization by filtering information according to user needs. Cal Bridge also reminds us that this improves "conventional electronic calendar systems," where "manually copying or forwarding events between calendars is error prone" and "can lead to double bookings and breaches of confidentiality[.]" *Id.* ¶ 12. OneCal thinks that all these solutions are "irrelevant" to our inquiry, MTD at 13 n.4, but we disagree because they buttress how Claim 11 is directed to improving existing computer capabilities—a consideration that *is* relevant under Step One. *See, e.g.*, *Data Engine Technologies LLC v. Google LLC*, 906 F.3d 999, 1008 (Fed. Cir. 2018) (holding that claims of "a specific method for navigating through three-dimensional electronic spreadsheets" were "not directed to an abstract idea" where their method provided "a specific solution to then-existing technological problems in computers and prior art electronic spreadsheets").

communication across interfaces that ordinarily do not speak to each other. Because Claim 11 eponymously "bridges" the gap between incompatible calendar systems, it's plainly focused "on a specific improvement . . . in how computers could carry out one of their basic functions," rather than "any asserted advances in uses to which *existing* computer capabilities could be put." *Elec. Power Grp.*, 830 F.3d at 1354 (referring to *Enfish, LLC*, 822 F.3d at 1335). After all, there (allegedly) weren't any *existing* cross-host synchronization capabilities in the electronic calendar space. So, OneCal is wrong to reduce Claim 11 to just software services "configured" to apply generic "rules" in the abstract,[3] or to something that a human could do by hand or by pressing some buttons.[4] By themselves, these points don't bring Claim 11 within the realm of the unpatentable abstract.

We'll illustrate this further by distinguishing our case from *University of Florida Research Foundation, Inc. v. General Electric Co.*, 916 F.3d 1363 (Fed. Cir. 2019) ("*UFRF*"), on which OneCal unpersuasively relies. *See* MTD at 12–13. In *UFRF*, the subject patent targeted hospitals' use of "pen and paper methodologies" to collect "bedside patient information" that were "manually entered into information systems"—a process the patent described as "very time-consuming," "expensive," and prone to "transcription errors." *UFRF*, 916 F.3d at 1367. To replace this manual system, the patent proposed "data synthesis technology" that used "device drivers written for . . . various bedside

---

[3] *See, e.g.*, *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1362–63 (Fed. Cir. 2018) (finding that the asserted claims passed Step One where they were "directed to an improved user interface for computing devices" because, although "the *generic idea of summarizing information* certainly existed prior to the invention," the claims recited "a *particular manner* of summarizing and presenting information," thereby "disclos[ing] a specific manner of displaying a limited set of information" and "recit[ing] a specific improvement over prior systems" (emphasis added)).

[4] *See, e.g.*, *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314–15 (Fed. Cir. 2016) (finding that the asserted claims passed step one where they were "focused on a specific asserted improvement in computer animation" and where "the computer . . . [was] employed to perform a *distinct process* to automate a task previously performed by humans," as the prior process performed by humans "was driven by subjective determinations rather than [the] specific, limited mathematical rules" of the asserted claims, and the defendants otherwise "provided no evidence that the process previously used by animators [was] the same as the process required by the claims").

machines" to present data "in a configurable fashion within a single interface." *Ibid.* (cleaned up). But the Federal Circuit held that the patent claims were "directed to abstract ideas" because the patent "acknowledge[d] that data from bedside machines was [already] previously collected, analyzed, manipulated, and displayed manually, and [the patent] simply propose[d] doing so with a computer." *Ibid.* (citations omitted). It also noted that the patent "nowhere identifie[d]," nor could the Court "see in the claims, any 'specific improvement to the way computers operate.'" *Ibid.* (quoting *Enfish, LLC*, 822 F.3d at 1336).

UFRF is inapposite here in at least two respects. *One*, we don't view the '739 Patent as a mere "pen and paper methodology" performed "on a computer." *Ibid.* As we've described, the patent claims a unique rule-based system that directs how a calendar entry on one host is translated into an entry on a different host, *and* it also decides which properties are carried over and what notifications are added. And it achieves all this through host-to-host commands triggered by API notifications, a specific process that (Cal Bridge) says can't be performed by hand or on the average computer without the '739 Patent. *See* Am. Compl. ¶ 14. *Two*, unlike the patent in *UFRF*, the '739 Patent *does* achieve systemic improvement rather than just a faster version of a human task. Cal Bridge pleads, after all, that the '739 Patent provides "specific implementations to achieve synchronization across calendar hosts" by solving "technical limitations" that otherwise produced "fragmented views," undermined "protection of confidential information," and complicated "event notification management." *Id.* ¶ 15. And Cal Bridge highlights the communication barrier its patent lifted, noting that, before the '739 Patent, calendar hosts were "configured to communicate with calendar clients," and "not with other calendar hosts, [which] hinder[ed] synchronization across different calendar hosts." *Id.* ¶ 9. We therefore don't agree that the '739 Patent is anything like the patent at issue in *UFRF*.

Claim 11 is thus plausibly directed to a non-abstract idea that improves computerized calendar operability—and *not* simply the use of a computer to organize schedules electronically. Claim 11 therefore clears *Alice*'s Step One.

ii.   *Alice* Step Two

Even if Claim 11 of the '739 Patent failed *Alice*'s Step One—and, for now, we think it doesn't—it easily passes Step Two. As we explained, Step Two looks to "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 78–79). The Supreme Court has described Step Two "as a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Ibid.* (quoting *Mayo*, 566 U.S. at 72–73). Step Two is satisfied when the claim limitations "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Aatrix Software, Inc.*, 882 F.3d at 1128 (quoting *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347–48 (Fed. Cir. 2014)).

We first reject OneCal's argument that Cal Bridge hasn't specifically pled any "patentable subject matter." MTD at 14. The problem, it says, is that Cal Bridge doesn't specify "the manner in which a computer could be 'configured' to synchronize various online calendars" or "describe[ ] the 'rules' the computer would follow[.]" MTD at 14.[5] But that overstates the pleading standard here. Cal

---

[5] Although OneCal frames this as an *Alice* Step One objection, the point it makes—that the '739 Patent "generically claims" a result through unspecified "rules" without describing the "manner" in which computers are "configured" to employ those rules—is, in substance, an inventive-concept critique. MTD at 14; *see, e.g.*, *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 223–24 (2014) (asking under Step Two whether the claim adds anything beyond "apply it with a computer" and holding that "wholly generic computer implementation" is not the sort of "additional feature" that supplies an inventive concept). We therefore address OneCal's argument under Step Two. As for Step One, we've already found that Cal Bridge sufficiently pled that Claim 11 is directed to a non-abstract idea, and we

Bridge need only make "'[c]oncrete allegations . . . that individual elements and the claimed combination are not well-understood, routine, or conventional activity' [to survive] a motion to dismiss under § 101." *Wanker v. United States*, 146 Fed. Cl. 582, 594 (Fed. Cl. 2020) (quoting *Aatrix*, 882 F.3d at 1128); *see also Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317–18 (Fed. Cir. 2019) ("As long as what makes the claims inventive is recited by the claims, the specification need not expressly list all the reasons why this claimed structure is unconventional.").

Cal Bridge has plausibly alleged that its claim "involve[s] more than performance of well-understood, routine, and conventional activities previously known to the industry." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (cleaned up). After all, Claim 11 *does* describe the configuration of its services. *See* Am. Compl. ¶ 30 (saying that "the database service is "configured to *store rules* . . . for propagating events from a first electronic calendar . . . to a second electronic calendar," and that "the calendar synchronization service is configured *to issue . . . one or more commands* . . . to generate" calendar events (emphasis added)). And, through these configurations, the '739 Patent claims "improve[ ] conventional systems" by essentially "implement[ing] a bridge between disparate calendar hosts . . . to overcome the technological shortcomings of traditional systems[.]" *Id.* ¶ 15. Cal Bridge doesn't explicitly describe this system as "unconventional" *per se*, but it *does* juxtapose its solution *against conventional* calendar systems that use "different proprietary APIs" with "[n]o standard commands" and which are "operable across different email hosts," making synchronization impossible. *Id.* ¶ 9. So, by harmonizing these incompatible structures, the '739 Patent achieves an unconventional result. We think that's *just* enough to plead that the patent accomplishes more than a conventional activity that improves computerized calendar systems. *See, e.g.*, *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300–01 (Fed. Cir. 2016) (holding that the claim was eligible at Step Two

---

therefore reject OneCal's assertion that the patent doesn't "point to any specific asserted improvement in computer capabilities." MTD at 14.

because it "entails an *unconventional* technological solution . . . to a technological problem," and the solution "requires that arguably generic components . . . operate in an unconventional manner to achieve an *improvement in computer functionality*" (emphasis added)). In any event, "[w]hether the claim elements or the claimed combination are well-understood, routine, conventional is a question of fact." *Ibid.* And, at the Rule 12(b)(6) stage, we "must accept as true all the factual allegations in the complaint." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001).

Next, OneCal argues that the '739 Patent fails Step Two because it "identifies only conventional computer equipment," like "networking hardware," "storage hardware," and "processing hardware," along with similarly "conventional and routine" "[API] software," which is "use[d] to interact with the hosted calendars." MTD at 14 (cleaned up). But even if Claim 11 relies on generic building blocks—like an API here or routine circuitry there—OneCal ignores what the claim actually arranges. Rather than simply communicate via API, the patent's synchronization service first "receive[s] a notification" through an API, *and then* it "commands . . . the second calendar host" to generate a calendar event "according to the rules for propagating events from the first . . . calendar[.]" Am. Compl. ¶ 30. This unique interaction, even if composed of generic components, is a technical improvement over prior ways of using calendar software—and so, it amounts to an inventive concept under Step Two. *Compare BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (finding that, although "[f]iltering content on the Internet was already a known concept," BASCOM's patent "describe[d] how *its particular arrangement* of elements is a *technical improvement* over prior art ways of filtering such content," and so, "construed in favor of [BASCOM]," the claims were "more than a drafting effort designed to monopolize the [abstract idea]" (emphasis added & cleaned up)), *and DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258–59 (Fed. Cir. 2014) (finding that, although the asserted claims "broadly and generically claim[ed] 'use of the Internet' to perform an abstract business practice," the patent "specif[ied] how interactions with the

17

Internet are manipulated to yield a desired result"—one that "overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink"—and so, "[w]hen the limitations . . . [were] *taken together as an ordered combination*," the claims "recite[d] an invention that [was] *not merely the routine or conventional use* of the Internet" (emphasis added)), *with xLoyalty, Inc. v. Maritz Holdings Inc.*, 986 F.3d 1367, 1377 (Fed. Cir. 2021) (finding that the claims failed *Alice*'s Step Two because they just computerized "transfers of information relating to a *longstanding commercial practice*" by having a "GUI . . . take[ ] the place of the human acting as an intermediary" and communicated "via [an] API" while "merely recit[ing] *generic and conventional* computer components (*i.e.*, 'processor,' 'GUI,' and 'API') and functionality for *carrying out*" the abstract idea, and because "communication of information by GUIs and APIs" was "*well-known* in the prior art" (emphasis added)). We therefore find that Cal Bridge has plausibly alleged more than just the routine implementation of generic computer components.

In short, OneCal hasn't shown that the '739 Patent claims are patent-ineligible under *Alice*. We therefore **DENY** the MTD as to Count I.

## II.     The Amended Complaint is a Shotgun Pleading as to Counts II–IV

OneCal next argues that Counts II–IV should be dismissed because they "incorporate all prior allegations into each count," leaving OneCal (and us) to guess at which facts support which claim. MTD at 4 n.3. Cal Bridge doesn't dispute that the Amended Complaint employs broad incorporation, but it contends that OneCal "is on clear notice" of its claims. *See* Resp. at 25. Cal Bridge is wrong. Counts II–IV are shotgun-pled and must be cured.

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must also "state its claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances." FED. R. CIV. P. 10(b). "Complaints that violate either Rule 8(a)(2) or

Rule 10(b), or both, are often disparagingly referred to as shotgun pleadings." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). Shotgun pleadings fall into four categories. In the words of the Eleventh Circuit, a complaint is a shotgun pleading if it:

> (1) contains multiple counts where each count adopts the allegations of all preceding counts; (2) is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) fails to separate into a different count each cause of action; or (4) asserts multiple claims against multiple defendants without specifying which defendant is responsible for which act.

*Embree v. Wyndham Worldwide Corp.*, 779 F. App'x 658, 662 (11th Cir. 2019) (citing *Weiland*, 792 F.3d at 1322–23). "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323.

OneCal is right that Cal Bridge incorporates by reference all antecedent paragraphs into Counts II–IV. *See* Am. Compl. ¶ 67 (as to Count II, "[t]he allegations in the preceding paragraphs are incorporated by reference as if fully set forth herein"); *id.* ¶ 75 (same as to Count III); *id.* ¶ 85 (same as to Count IV). It's true that "[a] complaint's incorporation by reference in each count of all preceding paragraphs is . . . an [ ] altogether commonplace convention in pleadings filed in federal court." *Craighead v. Austal USA, LLC*, 2017 WL 6559917, at *2 n.3 (S.D. Ala. Dec. 21, 2017); *cf. Amin v. Mercedes-Benz USA, LLC*, 349 F. Supp. 3d 1338, 1354 (N.D. Ga. 2018) (noting that litigants sometimes incorporate by reference all preceding paragraphs "to plead their claims as broadly as possible so as to avoid constraining the universe of facts on which a given claim might rely"). Still, that doesn't make the Amended Complaint, as to Counts II–IV, any less of a shotgun pleading. And Cal Bridge is wrong to suggest that OneCal's shotgun-pleading contentions are "untrue and unsupported by Eleventh Circuit precedent." Resp. at 5. The cases say exactly the opposite. *See, e.g.*, *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006) ("A shotgun pleading incorporate[s] every antecedent allegation by reference into each subsequent claim for relief or affirmative defense." (cleaned up));

*Edward v. BAC Home Loans Servicing, L.P.*, 534 F. App'x 888, 891 (11th Cir. 2013) (explaining that "a shotgun pleading is a pleading that incorporates every antecedent allegation by reference into each subsequent claim for relief," and that "[s]uch pleadings harm the courts by impeding their ability to administer justice" (citing *Wagner*, 464 F.3d at 1279)).

Shotgun pleadings aren't fixed by "exchang[ing] several letters prior to filing [the] lawsuit" to "place [the] Defendant on notice," as Cal Bridge purports to have done here. Resp. at 21. "The proper remedy for a shotgun pleading is for the court to order repleading for a more definite statement of the claim." *Muhammad v. Muhammad*, 654 F. App'x 455, 457 (11th Cir. 2016). Cal Bridge, for its part, *does* ask for that chance, *see* Resp. at 23 ("Though Cal Bridge believes it unnecessary here, Cal Bridge requests, in the alternative, the opportunity to amend to limit the three incorporation statements in Counts II–IV as needed."), and OneCal doesn't oppose amendment, *see, e.g.*, MTD at 15 ("[A]t minimum, the Court should require Cal Bridge to amend its complaint to qualitatively differentiate the non-patent claims from its claim of patent infringement."). We therefore **STRIKE** Counts II–IV as a shotgun pleading and **GRANT** Cal Bridge one opportunity to improve those counts in a second amended complaint.

*     *     *

But here's the thing: Even if Counts II–IV weren't shotgun-pled (and they are), we agree with OneCal that they each fail to state a plausible claim.

### III.    Count II Fails to State a Claim Under the Lanham Act

OneCal argues that Cal Bridge hasn't stated a viable claim under the Lanham Act. MTD at 18. *First*, it says that Cal Bridge hasn't pled a plausible false-advertising claim "because it has not meaningfully alleged how OneCal has misrepresented anything about the nature, characteristics, or qualities of Cal Bridge's product, beyond stating purely legal conclusions." *Id.* at 19. *Second*, OneCal adds, to the extent that Cal Bridge is trying to state a claim for "reverse passing off" or "trade dress

infringement," the Amended Compliant fails to satisfy the elements of these two claims. *Id.* at 19–20. OneCal is correct: Cal Bridge *has* failed to state a claim of false advertising, reverse passing off, or trade dress infringement under the Lanham Act.

Starting with false advertising, the Lanham Act prohibits the use of "any false or misleading description of fact, or false or misleading representation of fact" in commercial advertising or promotion that "misrepresents the nature, characteristics, qualities, or geographic origin" of goods, services, or commercial activities. 15 U.S.C. § 1125(a)(1)(B). "To prevail in a false advertising claim under the Lanham Act, [a plaintiff] must establish that '(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the plaintiff has been[,] or is likely to be, injured as a result of the false advertising.'" *Amf Bruns of Am., L.P. v. Valeda Co., LLC*, 2025 WL 2499758, at *2 (S.D. Fla. Apr. 24, 2025) (Dimitrouleas, J.) (quoting *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002)).

The Amended Complaint doesn't plausibly allege a false-advertising claim. As for the elements of deception, materiality, and injury, Cal Bridge largely just recites the elements, asserting that unspecified "false and misleading statements deceived and/or had the capacity to deceive consumers," did so "to affect their purchasing decision," and "diverted and/or are likely to divert customers from Plaintiff to Defendant." Am. Compl. ¶ 69. At best, Cal Bridge *does* plead the existence of advertising by identifying statements that OneCal allegedly made on a "CalendarBridge Alternative" page—*e.g.*, that, "[w]ith CalendarBridge, you can only synchronize two calendars at the same time" and "have to get in touch" for "customizable plans for 5 or more users"—which Cal Bridge alleges are "deceptive and false." *Id.* ¶ 24. Though Cal Bridge argues that these are "non-conclusory facts to support each element" of false advertising, Resp. at 22, it never bridges the gap between those supposed

misstatements and their required downstream effects. For instance, we don't really know *who* was actually deceived, *who* was even plausibly likely to be deceived, *how* the alleged deception materially affected any purchasing decisions, or *how* Cal Bridge was injured as a result, beyond Cal Bridge's conclusory refrain that OneCal allegedly "diverted and/or [is] likely to divert" customers away from its product. *Id.* ¶¶ 69–70.

Cal Bridge's reverse passing-off and trade-dress-infringement claims under the Lanham Act fare no better. At the outset, Cal Bridge completely fails to respond to these arguments. Cal Bridge's Response suggests that it ostensibly only meant to pursue a false-advertising and unfair-competition claim under Count II. *See, e.g.*, Resp. at 20 (arguing that the Amended Complaint "contains concrete, non-conclusory factual allegations supporting each element of false advertising/unfair competition under the Lanham Act"); *see also id.* at 22 (addressing only those "non-conclusory facts" that support a "false advertising and unfair competition" claim under the Lanham Act (cleaned up)). Cal Bridge has therefore abandoned any argument that it substantively stated a reverse passing-off or trade-dress-infringement claim. *See Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").

In any event, we agree that Cal Bridge has failed to state a plausible claim under *either* a reverse passing-off *or* a trade-dress-infringement theory. As for a reverse passing-off claim, the Lanham Act prohibits the use in commerce of "any word, term, name, symbol, or device, or any combination thereof" that's likely to cause "confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval" of goods, services, or commercial activities. 15 U.S.C. § 1125(a)(1). "To establish a claim under this section of the Lanham Act, known as 'reverse passing off,' a plaintiff must show: 1) 'the item at issue originated with the plaintiff; 2) the defendant falsely designated the origin of the work; 3) the false designation was likely to cause consumer confusion; and 4) the plaintiff was

harmed by the defendant's false designation.'" *Barrocos of Fla. v. Elmassian*, 2011 WL 13223913, at *4 (S.D. Fla. Sep. 29, 2011) (Ungaro, J.) (quoting *Portionpac Chem. Corp. v. Sanitech Sys., Inc.*, 217 F. Supp. 2d 1238, 1251 (M.D. Fla. 2002) (Kovachevich, J.)).

The Amended Complaint doesn't plausibly allege a claim of reverse passing off. On the element of false designation, Cal Bridge merely asserts that OneCal's "services are that of Plaintiff." Am. Compl. ¶ 70. It similarly alleges, in conclusory terms, that consumers "confused and/or [are] likely to confuse" OneCal's product as "associated with CalendarBridge." *Id.* ¶ 87. The pleading *does* allege some kind of copying, though. For instance, it says that OneCal's founder "signed up for Plaintiff's CalendarBridge services to gain access to" CalendarBridge's "functionality," *id.* ¶ 56, that OneCal then "closely monitor[ed]" CalendarBridge for "new features to implement," *id.* ¶ 57, and that OneCal designed its interface to be "strikingly similar and identical" to CalendarBridge's, *id.* ¶ 56. Even so, those allegations don't show any reverse passing off because Cal Bridge doesn't say that OneCal took Cal Bridge's item and sold it as its own, such as by removing Cal Bridge's identifying marks and rebranding its work under OneCal's name. *Compare, e.g.*, *Elmassian*, 2011 WL 13223913, at *4 ("In alleging that Elmassian 'intentionally omitt[ed] the Barrocos trademarks and copyright notice from the Flowers Collection and [sold] the Flowers Collection under his own brand,' causing consumers to be 'confused, mistaken, or deceived as to the source of origin,' . . . the Complaint adequately alleges a claim for reverse passing off." (citation omitted)), *with* Am. Compl. ¶¶ 56–57, 70, 84, 87 (alleging OneCal's access, monitoring, and creation of a "strikingly similar and identical" interface *without* identifying the relabeling of any Cal Bridge-original item as OneCal's).

Lastly, Cal Bridge hasn't stated a trade-dress-infringement claim. "To bring a successful trade dress infringement claim under the Lanham Act, a plaintiff must prove that (1) the defendant's product is confusingly similar to its product; (2) the similar features of the two products are primarily non-functional; and (3) the plaintiff's product is distinctive." *Miller's Ale House, Inc. v. Boynton Carolina*

*Ale House, LLC*, 702 F.3d 1312, 1322 (11th Cir. 2012) (citing *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1202 (11th Cir. 2004)). The Amended Complaint doesn't plausibly allege trade-dress infringement. Again, it says that OneCal made its "logo, fonts, styles, colors, website, and the interface" "strikingly similar and identical" to CalendarBridge's. Am. Compl. ¶ 70; *see also id.* ¶ 56 (same); *id.* ¶ 84 (alleging that OneCal "deliberately designed" its interface to "closely mimic" CalendarBridge's). That may suggest similarity, but trade-dress infringement *also* requires a showing of non-functionality and distinctiveness. And Cal Bridge never plausibly alleges that the look it's pointing to is mainly non-functional or that consumers recognized it as uniquely CalendarBridge's.

In short, the Amended Complaint doesn't state a plausible claim under theories of false advertising, reverse passing off, or trade-dress infringement. So, even if we weren't striking Count II because of its shotgun nature, we'd dismiss it for failure to state a claim under the Lanham Act. Cal Bridge will have one opportunity to replead this count properly.

## IV.    Counts III–IV are Vulnerable to Preemption

OneCal lastly argues that Count III (unfair competition under Florida law) and Count IV (violations of FDUTPA) should be dismissed as preempted by federal patent law. *See* MTD at 15–18. Specifically, it contends that "Counts III and IV fail to identify . . . the alleged wrongful conduct undertaken by OneCal apart from patent infringement and merely constitute a boilerplate recitation of state law causes of action." *Id.* at 18. So, since "the crux of the alleged 'unfair practice' upon which Cal Bridge relies for Counts III and IV is OneCal's alleged patent infringement," OneCal urges us to find that "both counts are preempted" and dismiss them. *Ibid.* Cal Bridge responds that it has pled "non-conclusory" facts satisfying the elements of unfair competition under Florida common law and FDUTPA. Resp. at 21–22.

We needn't reach this issue today because, as we've said, we're striking Counts III and IV as a shotgun pleading. Even so, Cal Bridge needs to do better the next time around. OneCal's preemption

argument doesn't squarely address Counts III and IV, but Cal Bridge *did* fairly invite a preemption attack by shotgun-pleading its counts and then doubling down.

"[W]hen determining whether federal patent law preempts a state law cause of action, we do not mechanically compare the required elements of the state law claim to the objectives embodied by federal patent law. Rather, we determine whether federal patent law preempts the state law claim because the state law claim as pled stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *BearBox LLC v. Lancium LLC*, 125 F.4th 1101, 1112 (Fed. Cir. 2025) (quotation omitted). That said, "even if [the state-law tort] requires the state court to adjudicate a question of federal patent law," it *won't* stand as an obstacle to federal patent law where "the state law cause of action includes additional elements not found in the federal patent law cause of action and is not an impermissible attempt to offer patent-like protection to subject matter addressed by federal law." *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1473 (Fed. Cir. 1998). Here, Count III invokes Florida common-law unfair competition, which requires "deceptive or fraudulent conduct of a competitor and likelihood of consumer confusion." *Webster v. Dean Guitars*, 955 F.3d 1270, 1277 (11th Cir. 2020) (quotation omitted). And Count IV invokes FDUTPA, which requires "(i) a deceptive act or unfair practice; (ii) causation; and (iii) actual damages." *Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 721 F. App'x 865, 876 n.13 (11th Cir. 2018) (citations omitted).

OneCal's core argument is that Counts III and IV don't specifically identify any wrongful conduct apart from patent infringement. True, Cal Bridge pleads the state-law elements—at least in the abstract. For Count III, it alleges "deceptive business practices" and a "likelihood of confusion," and it claims that those practices "caused confusion among consumers." Am. Compl. ¶¶ 76–79. For Count IV, it likewise invokes FDUTPA's language, alleging "unfair methods of competition" and "unfair or deceptive acts," *id.* ¶ 86, plus causation and "actual damages," *id.* ¶ 90. The problem, though, is that these recitations follow the *wholesale incorporation* of all of Cal Bridge's prior allegations "as if

fully set forth herein," *id.* ¶ 75 (as to Count III); *see also id.* ¶ 85 (as to Count IV), which include the *entire* patent-infringement claim. And Count III never really identifies *what* non-patent conduct is doing the work to satisfy Florida's common-law, unfair-competition elements. Count IV presents the *additional* problem of actually *framing* part of its FDUTPA theory in patent-like terms. For example, Cal Bridge repeats that OneCal "gained access" to CalendarBridge's "system and its functionality," that it "closely monitor[ed]" CalendarBridge for "new features to implement," and that it "launched . . . its *infringing* multi-calendar synchronization OneCal system." *Id.* ¶ 87 (emphasis added). That sounds an awful lot like a patent-infringement claim to us. *See* 35 U.S.C. § 271(a) (providing that "whoever without authority makes, uses, or sells any patented invention . . . infringes the patent"). So, by importing its patent claim wholesale and then leaning on facts related to OneCal's alleged copying and implementation of the CalendarBridge solution, we agree that Cal Bridge doesn't properly separate Counts III and IV from its patent claim, which makes those claims vulnerable to preemption.

At the same time, because Counts III and IV sweep in *all* the Amended Complaint's allegations, they don't incorporate *only* patent-infringement facts. For one thing, both state-law theories, at bottom, turn on deception. As we said, FDUTPA requires "a deceptive act or unfair practice," *Viridis Corp.*, 721 F. App'x at 876 n.13, and unfair competition under Florida common law similarly requires a showing of "deceptive or fraudulent conduct," *Webster*, 955 F.3d at 1277. And Cal Bridge pleads various kinds of allegedly deceptive behavior. It points to OneCal's statements on its "CalendarBridge alternative" page, including the assertion that, "[w]ith CalendarBridge, you have to get in touch in order to get customizable plans for 5 or more users," even though (Cal Bridge says) the CalendarBridge solution actually permits self-signup without requiring users to "get in touch" with it "to enable multi-user functionality." Am. Compl. ¶ 24 (cleaned up). It also avers that OneCal "deliberately designed" its website and interface to "closely mimic" CalendarBridge's "logo, fonts, styles, colors, website, and the interface." *Id.* ¶ 84. For another, Florida's unfair-competition law also

requires a "likelihood of consumer confusion," *Webster*, 955 F.3d at 1277, which Cal Bridge tries to plead, too. It says, for instance, that OneCal's mimicry "confused and/or is likely to confuse consumers into believing" that OneCal's product is "associated with CalendarBridge." Am. Compl. ¶ 84; *see also id.* ¶ 78 (alleging that OneCal's conduct "continues to cause confusion among consumers"). Of course, we're not saying that these facts, as pled, establish ironclad claims under Florida's unfair-competition law or FDUTPA. The point we're making here is that the Amended Complaint doesn't rest *exclusively* on patent-infringement facts, so OneCal's preemption argument isn't colorable now.

So, although we've already stricken Counts III and IV as a shotgun pleading, we agree that Cal Bridge should "amend its complaint to qualitatively differentiate the non-patent claims from its claim of patent infringement." MTD at 15. If Cal Bridge repleads Counts III and IV, it must identify, count by count, the specific non-patent conduct that it believes satisfies the relevant state-law elements, and it must avoid simply repackaging its patent-infringement theory.

### CONCLUSION

We therefore **ORDER and ADJUDGE** as follows:

1. As to Count I of the Amended Complaint [ECF No. 21], the Defendant's Motion to Dismiss [ECF No. 27] is **DENIED**.

2. As to Counts II–IV of the Amended Complaint [ECF No. 21], the Motion to Dismiss is **GRANTED**. We **STRIKE** those counts.

3. The Plaintiff may file a second amended complaint within fourteen days of this Order.

**DONE AND ORDERED** in the Southern District of Florida on January 24, 2026.

_____
ROY K. ALTMAN
UNITED STATES DISTRICT JUDGE

cc:     counsel of record